# Broadpoint.

Broadpoint Capital, Inc.

July 25, 2008

**PERSONAL & CONFIDENTIAL**

Mr. Edward R. DeStefano
Chief Executive Officer
New Century Energy Corp.
1770 St. James Place, Suite 380
Houston, TX. 77056

Dear Mr. DeStefano:

    Broadpoint Capital, Inc. ("Broadpoint") is pleased to be engaged by New Century Energy Corp. and its debtor affiliates (collectively, the "Company") to act as financial advisor to the Company in connection with the services described herein. This letter agreement (the "Agreement") will confirm our mutual understanding of the terms of this engagement.

1.    Scope of Services: In connection with the Company's bankruptcy cases (the "Cases"), Broadpoint will perform the following services, among others, for the Company:

(a)    Providing advice and assistance to the Company in connection with analyzing, structuring, negotiating and effecting (including providing valuation analyses as appropriate), and acting as exclusive financial advisor to the Company in connection with, any potential or proposed strategy for restructuring of the Company's outstanding indebtedness (including, without limitation, the Company's Secured Convertible Term Note due June 30, 2008 (the "Secured Convertible Term Note"), the Secured Term Note due June 30, 2008 (the "Secured Term Notes")), the Secured Term Note due January 4, 2010 (the "December 2006 Term Note"), the Secured Term Note due November 30, 2010 (the "November 2007 Notes"), the Secured Term Note due April 26, 2009 issued by Gulf Coast Oil Corp. (the "Gulf Coast Term Note") and the Secured Term Note due November 22, 2010 issued by Gulf Coast Oil Corp. (the "November 2007 Promissory Notes")), whether pursuant to a plan of reorganization, a sale of assets or equity under section 363 of chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), any offer by the Company with respect to any outstanding Company indebtedness, a solicitation of votes, approvals, or consents giving effect thereto (including with respect to a prepackaged or prenegotiated plan of reorganization or other plan pursuant to the Bankruptcy Code), the execution of any related agreement, an offer by any party to restructure, recapitalize, exchange or acquire any outstanding Company indebtedness, or any similar restructuring involving the Company (any such transaction considered in this paragraph is hereinafter referred to as a "Debt Restructuring").

(b)    Providing advice and assistance to the Company in connection with analyzing, structuring, negotiating and effectuating, and identifying potential investors in, any financing transaction involving the Company pursuant to a rights offering or

public or private offering of securities (whether in the form of debt, equity, equity-linked or convertible securities), any Debtor-in-Possession financing facility or any exit financing facility, including identifying potential lenders in connection therewith, or the arrangement of a subordinated participation therein, or any other similar transaction or series of transactions, or any combination thereof (any such transaction considered in this paragraph is hereinafter referred to as a "Financing Transaction," which together with a Debt Restructuring, is hereinafter referred to as a "Restructuring").

(c) Assisting and advising the Company in connection with analyzing, structuring, negotiating and effectuating, and identifying potential acquirors in connection with, the potential sale of the Company, or a controlling interest in the Company, or all or substantially all of the Company's assets or securities, through any structure or form of transaction or series of transactions, including, but not limited to, any direct or indirect acquisition, sale of assets, merger, consolidation, joint venture, restructuring, transfer of securities, or any similar or related transaction or series of transactions or any combination thereof (an "M&A Transaction," and collectively with the defined terms Debt Restructuring and Financing Transaction, "Transaction(s)").

(d) Performing the following additional financial advisory services, among others, for the Company: (a) to the extent that Broadpoint deems appropriate, becoming familiar with, and analyzing, the business, operations, properties, financial condition and prospects of the Company; (b) advising the Company on the current state of the restructuring market, financial markets and industries in which the Company does business; (c) assisting and advising the Company in developing a general strategy for accomplishing any proposed Transaction(s); (d) assisting and advising the Company in implementing any Transaction(s) on behalf of the Company; (e) assisting and advising the Company in evaluating and analyzing any Transaction(s); and (f) rendering such other services as may from time to time be agreed upon by the Company and Broadpoint, including, but not limited to, providing expert testimony, and other expert and financial advisory support, related to any threatened, expected, or initiated litigation.

The scope of Broadpoint's engagement shall be limited to those matters expressly set forth in this Agreement and shall not include tax, legal, regulatory, accounting or other technical advice or services. This Agreement shall not constitute an offer, agreement or commitment to lend by Broadpoint or its affiliates.

2. Fees: The Company agrees to pay to Broadpoint all of the following applicable fees:

(a) A monthly fee (the "Monthly Fee") equal to $90,000 per month until the expiration or termination of this Agreement. The first Monthly Fee shall be payable upon the execution of this Agreement, and each subsequent Monthly Fee shall be payable in advance on the first day of each month. If payment of the first Monthly Fee is made for a partial month based upon the date on which this

2

Agreement is executed, then such Monthly Fee shall be pro rated from the date on which this Agreement is executed to the end of such month.

(b) Upon the consummation of any Financing Transaction, an additional fee in an amount equal to: (i) six percent (6.0%) of the aggregate gross proceeds from the sale of any equity securities; plus (ii) three percent (3.0%) of the aggregate gross proceeds and/or committed amount of any debt raised or placed involving a first lien on existing assets; (iii) three percent (3.0%) of the aggregate gross proceeds of any debt raised involving a second lien on existing assets; and (iv) four percent (4.0%) of the aggregate gross proceeds of any other debt raised in each such Financing Transaction, including, but not limited to, high-yield notes, convertible notes, mezzanine notes or term loans (the "Financing Fee").

(c) Upon the consummation of a Debt Restructuring or similar transaction, an additional transaction fee in an amount equal to $1,500,000 (the "Restructuring Fee"). For the purposes of this paragraph, restructured liabilities shall include all cash, cash equivalents, securities, trust, sale, or litigation interests, or other indebtedness that is forgiven, compromised, modified or otherwise affected by any such transaction consummated in connection with the services provided by Broadpoint hereunder.

(d) An additional fee (an "M&A Transaction Fee") in respect of each M&A Transaction, equal to 3.0% of the Aggregate Transaction Value (as defined below); provided that, notwithstanding the foregoing, in the event that less than 50% of the Company's voting stock or assets are acquired or transferred in any sale transaction or series of transactions that do not constitute an M&A Transaction (a "Minority Investment Transaction"), the Company agrees to pay to Broadpoint a fee equal to 3.0% of the Aggregate Transaction Value, subject to a maximum fee equal to the M&A Transaction Fee that would be applied under the above formula in the event that 100% of the Company's securities or assets were acquired at a valuation implied by such Minority Investment Transaction. The M&A Transaction Fee or any other fee arising under this paragraph shall be due and payable in cash by wire transfer upon the closing of such M&A Transaction or upon the closing of any other transaction hereunder.

As used in this Agreement, the term "Aggregate Transaction Value" shall mean, without limitation, the total value of all consideration (including cash, securities, notes and other property) paid or issued or to be paid or issued by the acquiring entity in connection with any M&A Transaction or Minority Investment Transaction (including, without limitation, amounts payable (A) to holders of options, warrants, stock purchase rights, convertible securities or similar rights and (B) in respect of employment or consulting agreements, agreements not to compete or similar arrangements), plus all debt of the Company outstanding as of the closing date of, or directly or indirectly assumed, refinanced or extinguished in connection with, an M&A Transaction or Minority Investment Transaction, plus in the context of an asset sale (i) the value of any current assets not sold, minus (ii) the value of any current liabilities not assumed. Any amounts to be

3

paid contingent upon future events shall be estimated and calculated at an expected present value mutually agreeable to the Company and Broadpoint at the time of closing, except that any amounts held in escrow will be deemed paid at closing. If the Aggregate Transaction Value or a portion thereof is in the form of debt or equity securities, then the amount of the Aggregate Transaction Value will be based on the fair market value of such securities. In the event an M&A Transaction or Minority Investment Transaction takes the form of, or is preceded by, a recapitalization or similar transaction, Aggregate Transaction Value also shall include the fair market value of the equity securities of the Company retained by the Company's security holders. Aggregate Transaction Value also shall include the aggregate amount of any (i) dividends or other distributions declared by the Company with respect to its securities after the date of this Agreement (other than normal recurring cash dividends in amounts not materially greater than currently paid) and (ii) amounts payable by the Company to repurchase any of its securities outstanding on the date of this Agreement (excluding repurchases pursuant to and consistent with any currently existing stock repurchase program of the Company).

In the event an M&A Transaction or Minority Investment Transaction takes the form of a joint venture, partnership or similar structure, Aggregate Transaction Value shall mean the total amount of cash plus the fair market value of all securities and other property paid or payable by the acquiring entity, directly or indirectly, to such joint venture, partnership or other entity. "Fair Market Value" shall be determined (a) with respect to any property other than securities, as mutually agreed upon by the Company and Broadpoint, and (b) with respect to securities, as follows: (i) if the securities are traded on a registered national exchange, the average of the closing sale prices for such securities on the registered national exchange providing the primary market in such securities for the five consecutive trading days ending three trading days prior to the closing date of the M&A Transaction or Minority Investment Transaction; (ii) if the securities are not traded on a registered national exchange, the average of the closing bid prices as reported by the National Association of Securities Dealers Automated Quotation System for the five consecutive trading days ending three trading days prior to the closing date of the Transaction; or (iii) if the securities are not traded or reported, by agreement between the Company and Broadpoint. In connection with a purchase of 50% or more (but not 100%) of the outstanding voting stock of the Company, the M&A Transaction Fee will be calculated under the definition of Aggregate Transaction Value set forth above as though 100% of the outstanding voting stock on a fully-diluted basis had been acquired or transferred for the same per share price paid in the Transaction and, if appropriate, Broadpoint's services pursuant to this Agreement will continue after control is obtained to assist the Company with a second-step merger or similar transaction.

(e) In addition to the fees to be paid to Broadpoint as provided in Section 2 hereof, without regard to whether a Transaction is consummated or this Agreement expires or is terminated, the Company shall pay to, or on behalf of, Broadpoint, promptly as billed, all fees, disbursements and out-of-pocket expenses incurred by

4

Broadpoint in connection with its services under this Agreement (including, without limitation, the fees and disbursements of Broadpoint's in-house and outside legal counsel, travel and lodging expenses, word processing charges, research expenses, communication expenses, messenger and duplicating services, facsimile expenses and other customary expenditures) up to a maximum of $10,000 per month. Any amounts greater than $10,000 must be approved in advance, in writing, by the Company before any expenditure is made. The Company will only be obligated to reimburse airfare for normal coach airfare charges.

All amounts payable to Broadpoint under the terms of this Agreement are net of all applicable value-added and similar taxes.

The Company shall use its best efforts to provide for the payment in full, in cash, of any applicable fees and expenses described in this Section 2 in any plan(s) of reorganization for the Company submitted to any bankruptcy or district court for confirmation. Notwithstanding the foregoing, in the event that any Transactions are consummated pursuant to a prepackaged plan(s) of reorganization, the fees payable to Broadpoint hereunder shall be deemed earned and payable in full upon the receipt by the Company of the votes necessary to approve any such prepackaged plan(s) of reorganization (whether through cramdown or otherwise) prior to the filing of the chapter 11 bankruptcy case. Additionally, in the event that any Transactions are consummated pursuant to a prenegotiated plan(s) of reorganization, the fees payable to Broadpoint hereunder shall be deemed earned and payable in full upon the receipt by the Company of lock-up agreements or other commitments to support such prenegotiated plan(s) of reorganization from members of any informal or ad hoc prepetition committee of creditors prior to the filing of any chapter 11 bankruptcy case by the Company.

The Company acknowledges that in light of Broadpoint's substantial experience, the uncertain nature of the time and effort that may be expended by Broadpoint in fulfilling its obligations under this Agreement, the costs associated with undertaking this engagement, and the "market rate" for professionals similar to Broadpoint, the fee arrangement hereunder is just, reasonable and fairly compensates Broadpoint for its services.

The Company further acknowledges and agrees that except as may otherwise be expressly set forth herein, each applicable fee described above for any Transaction shall be additive to any fees earned by Broadpoint relating to any other Transaction. For avoidance of doubt, Broadpoint can and shall earn and be paid the aggregate applicable fees owing to Broadpoint for each and every Transaction involving the Company pursuant to the terms of this Agreement.

All amounts owing to Broadpoint hereunder shall be the joint and several liability of the Company and each of its debtor affiliates and, unless otherwise agreed by Broadpoint in its sole and absolute discretion, shall be made in cash by wire transfer of immediately available U.S. funds, without deduction for any tax to an account designated by Broadpoint immediately when due and payable under this Agreement, subject to any necessary approvals of the bankruptcy court presiding over the Cases (the "Bankruptcy Court"). No amounts paid or payable to Broadpoint or any of its affiliates under this Agreement shall be credited against any other

amounts paid or payable to Broadpoint except as otherwise expressly stated in this Agreement. Subject to Bankruptcy Court approval, the Company's obligation to pay any fee or expense set forth herein shall be absolute and unconditional and shall not be subject to reduction by way of setoff, recoupment or counterclaim.

    3.    <u>Information; Use of Name</u>: The Company will furnish to Broadpoint (and, if appropriate, will request that any acquiring entity or financing entity furnish to Broadpoint) such information as Broadpoint believes relevant and appropriate to Broadpoint's services under this Agreement, or which Broadpoint requests, and agrees to cooperate fully with Broadpoint in connection with its financial review, analysis and services under this Agreement. The Company recognizes and agrees that, in performing the services contemplated by this Agreement, Broadpoint will be relying upon information furnished by the Company and, if appropriate, any acquiring or financing entity, as well as information available from public sources. Broadpoint will not assume responsibility for independently verifying any such information and Broadpoint will not make an independent evaluation or appraisal of any assets or liabilities (contingent or otherwise) of the Company or the acquiring or financing entity and, accordingly, the Company agrees that any information provided by or on behalf of the Company will be complete and accurate in all material respects, will not be misleading and will not omit any material fact or document, and that the Company will promptly notify Broadpoint if it learns of any material inaccuracy, omission or misleading statement in any information previously delivered to Broadpoint.

    Broadpoint will treat confidentially non-public information concerning the Company and its business that the Company discloses to Broadpoint in connection with this engagement for a period from the date of this Agreement to the date of termination or expiration of this Agreement and, except as otherwise required by law, regulation (including regulations or rules of any governmental agency or self-regulatory agency with appropriate jurisdiction) or legal process, Broadpoint will not disclose such information to a third party without the Company's consent, which consent shall not be unreasonably withheld.

    No advice rendered by Broadpoint, whether formal or informal may be disclosed, in whole or in part, summarized or otherwise referred to without Broadpoint's prior written consent. In addition, Broadpoint may not be otherwise referred to by the Company or its agents or professionals without Broadpoint's prior written consent, which consent will immediately expire upon Broadpoint's resignation or any termination or expiration of this Agreement. Notwithstanding anything in this Agreement to the contrary, Broadpoint and the Company shall be permitted, subject to applicable laws, to disclose the tax treatment and tax structure of any Transaction (including any materials, opinions or analyses relating to such tax treatment or tax structure).

    Broadpoint's advice is solely for the use and information of the Company, and is only to be used in considering the matters to which this Agreement relates. Such advice may not be relied upon by any other person, including, but not limited to, any official committee appointed in these Cases or any member of any such committee, or any security holder, employee or creditor of the Company, and may not be used or relied upon for any other purpose.

6

The Company agrees that Broadpoint, at its option and expense, has the right to place advertisements in financial and other newspapers and journals describing its services to the Company hereunder. If requested by Broadpoint, the Company shall include a mutually acceptable reference to Broadpoint in any press release (or other public announcement) made by the Company announcing a Transaction. At any time after the consummation or other public announcement of the closing of any Transaction contemplated herein, Broadpoint may use the name and logo of the Company and a brief description of such transaction in publications and/or marketing materials prepared and distributed by Broadpoint.

Broadpoint and the Indemnified Persons (as defined in Schedule A hereto) shall not be deemed agents or fiduciaries of the Company, any official committee appointed in the Cases, any member of any such committee, or any other security holder, employee or creditor of the Company, and will not have the authority to legally bind any of the foregoing.

4. **Exclusivity; Contractual Duties; No Assurances**: The Company acknowledges and agrees that Broadpoint has been retained to act solely as exclusive financial advisor to the Company. The Company agrees that it will not engage any other person to perform any financial advisory or similar services with respect to any potential Transaction or the services described herein. If the Company is contacted by any person concerning a potential Transaction, the Company will promptly inform Broadpoint of such inquiry, and all relevant details thereof. Broadpoint will act under this Agreement as an independent contractor and any duties of Broadpoint arising out of its engagement pursuant to this Agreement shall be owed solely to the Company. It is understood that Broadpoint's responsibility to the Company is solely contractual in nature and that Broadpoint does not owe the Company or any of its affiliates, security holders, creditors, any other party or any official committee appointed in the Cases, any fiduciary duty, contractual duty or agency relationship as a result of its engagement under this Agreement.

This Agreement may not be assigned by either Broadpoint or the Company without the written consent of the other party, which consent shall not be unreasonably withheld. The benefits of, and the obligations and liabilities assumed in, this Agreement shall inure to the benefit of, and be binding upon, Broadpoint's and the Company's respective successors and permitted assigns.

This Agreement does not constitute a commitment or obligation by Broadpoint or any of its affiliates to provide any financing which may be required or advisable in connection with any Transaction contemplated herein. By signing this Agreement, the Company expressly acknowledges that Broadpoint does not guarantee, warrant or otherwise provide assurance that the Company will be able to implement or consummate any Transaction or Restructuring contemplated herein, or achieve any other result.

5. **Indemnity**: As further consideration under this Agreement, the Company and its estates shall indemnify and hold harmless the Indemnified Persons (as defined in Schedule A) in accordance with Schedule A hereto. The terms and provisions of Schedule A are incorporated herein by reference, constitute a part of this Agreement, and shall survive any termination or expiration of this Agreement.

7

6. <u>Disclosures</u>: Broadpoint Securities Group, Inc. and its subsidiaries, and affiliates (collectively, "Broadpoint") are involved in a wide range of investment banking and other activities (including investment management, corporate finance and securities issuing, trading and research) from which conflicting interests, or duties, may arise. Broadpoint has implemented procedures designed to prevent (when appropriate to prevent) the dissemination of non-public information between departments and these procedures have been implemented to permit continuation of the routine activities of these departments regardless of the activities, or knowledge, of the other departments. Accordingly, knowledge of the confidential information by personnel of one department should not be imputed to personnel of other departments not in actual possession of such confidential information. Information that is held elsewhere within Broadpoint, but of which none of the individuals in Broadpoint's investment banking department involved in providing the services contemplated by this Agreement actually has knowledge, will not for any purpose be taken into account in determining Broadpoint's responsibilities to the Company under this Agreement. Neither Broadpoint Securities Group, Inc., nor any of its subsidiaries or affiliates, will have any duty to disclose to the Company or any other party, or utilize for the Company benefit, any non-public information acquired in the course of providing services to any other person engaging in any transaction (on its own account or otherwise) or otherwise. In addition, in the ordinary course of business, Broadpoint may trade the securities of the Company, its creditors, securityholders, members of any official committee appointed in the Cases, and of parties in interest or potential participants in any Restructuring or other Transaction contemplated herein, for its own account and for the accounts of customers, and may at any time hold a long or short position in any such securities. The Company acknowledges that from time to time Broadpoint's research department may publish research reports or other materials, the substance and/or timing of which may conflict with the views or advice of the members of Broadpoint's investment banking department, which reports or materials may have an adverse effect on the Company interests in connection with the Restructuring or any Transaction contemplated herein or otherwise. Broadpoint's investment banking department is managed separately from its research department, and does not have the ability to prevent such occurrences.

7. <u>Term of Agreement</u>: Broadpoint's engagement hereunder will run from the effective date of this Agreement as approved by a final order of the Bankruptcy Court that is acceptable to Broadpoint in its sole and absolute discretion (the "<u>Effective Date</u>") to the earlier of the date on which (A) each of these Cases is either (i) dismissed, (ii) converted to cases under chapter 7 of the Bankruptcy Code, or (iii) subject to a plan of reorganization that has been confirmed by the Bankruptcy Court and has become effective, or (B) Broadpoint's services hereunder are terminated by either Broadpoint or the Company on fifteen (15) days written notice to the other. Upon any termination of this Agreement, the Company shall immediately pay or cause to be paid to Broadpoint any accrued but unpaid fees hereunder, and shall reimburse Broadpoint for any unreimbursed expenses. In the event of any termination of this Agreement, Broadpoint shall be entitled to any applicable fees described in Section 2 of this Agreement, and such applicable fees shall be immediately due and payable, if any Transactions are consummated prior to that date which is one (1) year from of the date of any termination of this Agreement. Upon any termination of this Agreement, the rights and obligations of the parties hereunder shall terminate, except for the obligations set forth in Sections 2, 3, 5, 7, 9, 11, and <u>Schedule A</u> hereto, which shall remain and in full force and effect, and shall be binding upon, and shall inure to the benefit of, any successors, assigns, heirs and representatives of the Company, any official

8

committee or other trustee or examiner appointed in the Cases, Broadpoint, the Indemnified Persons, and any chapter 7 trustee appointed in the Cases.

8. <u>Bankruptcy Court Approval</u>. The Company shall use its best efforts to obtain prompt approval of this Agreement, pursuant to sections 327, 328 and 1103 of the Bankruptcy Code, from the Bankruptcy Court. Such approval shall provide for the retention of Broadpoint *nunc pro tunc* to the commencement date of the Cases, shall incorporate all of the terms and conditions herein (explicitly including, but not limited to, the Company's acknowledgements and obligations set forth in <u>Schedule A</u>), shall bind the Company to such terms and conditions, and shall provide that Broadpoint's compensation shall be subject to the standard of review provided for in section 328(a) of the Bankruptcy Code, and not subject to any other standard of review under section 330 of the Bankruptcy Code. The Company agrees that the application to retain Broadpoint pursuant hereto, and the proposed order in connection therewith, will be subject to the prior approval of Broadpoint in its sole and absolute discretion, and agree that this Agreement (except for the obligations under Section 2 and <u>Schedule A</u> hereto) shall be null and void and Broadpoint shall have no obligations hereunder unless such a final order, no longer subject to appeal, rehearing, reconsideration or petition for certiorari, which is acceptable to Broadpoint in its sole and absolute discretion, is entered by the Bankruptcy Court.

9. <u>Choice of Law; Venue</u>: THIS LETTER AGREEMENT AND SCHEDULE A HERETO SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO ITS CONFLICTS OF LAW PRINCIPLES. BROADPOINT AND THE COMPANY (ON ITS OWN BEHALF AND, TO THE EXTENT PERMITTED BY LAW, ON BEHALF OF ITS SECURITY HOLDERS, CREDITORS AND OTHER CONSTITUENCIES) EACH WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, CLAIM, SUIT OR PROCEEDING WITH RESPECT TO BROADPOINT'S ENGAGEMENT AS FINANCIAL ADVISOR OR ITS SERVICES HEREUNDER. SOLELY FOR THE PURPOSE OF ENFORCING THIS LETTER AGREEMENT AND THE RELATED INDEMNIFICATION LETTER, THE COMPANY HEREBY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT PRESIDING OVER THE COMPANY'S BANKRUPTCY CASES OR, IF SUCH BANKRUPTCY COURT DECLINES JURISDICTION OVER ANY SUCH MATTER, THE FEDERAL AND STATE COURTS OF THE STATE OF NEW YORK, AGREES NOT TO COMMENCE ANY ACTION, SUIT OR PROCEEDING EXCEPT IN SUCH COURTS AND WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO MOVE TO DISMISS OR TRANSFER ANY ACTION, SUIT OR PROCEEDING BROUGHT IN ANY SUCH COURTS ON THE BASIS OF ANY OBJECTION TO PERSONAL JURISDICTION, VENUE OR INCONVENIENT FORUM. SERVICE OF PROCESS, SUMMONS, NOTICE OR DOCUMENT BY MAIL TO THE COMPANY'S ADDRESS SET FORTH ABOVE SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY ACTION, SUIT OR PROCEEDING BROUGHT IN SUCH COURTS.

10. <u>Miscellaneous</u>. This Agreement, together with <u>Schedule A</u> hereto, incorporates the entire agreement between the parties with respect to the subject matter hereof, supersedes all previous agreements relating to the subject matter hereof (should they exist), and may not be amended or modified except in writing signed by each party hereto. If any provision hereof shall be determined to be invalid or unenforceable in any respect, such determination shall not affect

such provision in any other respect nor any other provision hereof. Headings used herein are for convenience of reference only and shall not affect the interpretation or construction of this Agreement. This Agreement may be executed in one or more facsimile counterparts, each of which will be deemed to be an original and all of which together will be deemed to be one and the same document. No waiver, amendment or other modification of this Agreement shall be effective unless in writing and signed by each party to be bound hereby, subject to any necessary Bankruptcy Court approval.

        11.    <u>Notices</u>. Notice given pursuant to any of the provisions of this Agreement shall be in writing and shall be mailed or delivered (a) if to the Company, at the address and to the addressee set forth above, and (b) if to Broadpoint, at the offices of Broadpoint at One Penn Plaza, 42nd Floor, New York, NY 10119-4000, Attention: Patricia Arciero-Craig.

# Broadpoint.

Broadpoint Capital, Inc.

If the foregoing meets with your approval, please sign this Agreement and return an executed copy to us. We look forward to working with you in this important undertaking.

Very truly yours,

**BROADPOINT CAPITAL, INC.**

By: _____
Name: Tim O'Connor
Title: Managing Director

Agreed and accepted as of the
date first written above:

**NEW CENTURY ENERGY CORP.,
ON BEHALF OF ITSELF AND
ITS DEBTOR AFFILIATES**

By: _____
Name: Edward R. DeStefano
Title: Chief Executive Officer

## SCHEDULE A

Reference is hereby made to the engagement letter annexed hereto (the "Agreement") among Broadpoint and the Company. Unless otherwise defined herein, all capitalized terms used in this Schedule A shall have the meanings ascribed to them in the Agreement.

Any and all obligations and agreements of the Company under this Schedule A shall be equally applicable to, and binding upon, each of the Company's bankruptcy estates and any trustee appointed in the Company's bankruptcy cases.

The Company and its estates agree to indemnify and hold harmless Broadpoint and its affiliates, and each of their respective owners, securityholders, directors, officers, managers, members, parents, partners, counsel, agents and employees, and each other person, if any, controlling Broadpoint or any of its affiliates (collectively, "Indemnified Persons") from and against, any losses, claims, damages, liabilities and expenses (collectively, "Losses") related to or arising out of or in connection with the Agreement, Broadpoint's services under the Agreement, any Transaction, occurrence or obligation contemplated by the Agreement, or any Indemnified Person's role in connection therewith (including, without limitation, related to or arising out of or in connection with (i) statements or omissions made, or information provided, by Indemnified Persons or (ii) actions or failures to act by Indemnified Persons.

The Company further agrees that no Indemnified Person shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Company or the Company's owners, securityholders, creditors, directors, officers, managers, members, parents, partners, counsel, agents, employees, subsidiaries or affiliates related to or arising out of or in connection with the Agreement, Broadpoint's services under the Agreement, any Transaction, occurrence or obligation contemplated by the Agreement, or any Indemnified Person's role in connection therewith, except to the extent that such liability is found by a court of competent jurisdiction in a final, non-appealable judgment to have resulted solely from gross negligence or willful misconduct of such Indemnified Person.

The Company further agrees to reimburse each Indemnified Person for all expenses (including, without limitation, reasonable fees and disbursements of in-house or outside counsel, and expenses incurred in connection with responding to third party subpoenas) as they are incurred by such Indemnified Person in connection with investigating, preparing for, defending or settling any action, claim, investigation, inquiry, arbitration or other proceeding, or enforcing the terms of this Schedule A or the Agreement (each an "Action"), whether or not pending or threatened and whether or not any Indemnified Person is a party to any such Action.

Notwithstanding the foregoing, the Company shall not be liable to any Indemnified Person for any Losses to the extent that a court of competent jurisdiction shall have determined by final non-appealable judgment that such Losses resulted solely from the gross negligence or willful misconduct of such Indemnified Person.

If any indemnification or reimbursement sought pursuant to this Schedule A were for any reason (by judicial determination or otherwise) not to be available to any Indemnified

Person or insufficient to satisfy all Losses of such Indemnified Person, in each case, as and to the extent contemplated by this Schedule A, then the Company, in lieu of indemnifying or reimbursing such Indemnified Person, shall contribute to the amount paid or payable by such Indemnified Person with respect to such Losses (including expenses relating thereto) (i) in such proportion as is appropriate to reflect the relative benefits received (or anticipated to be received) by Broadpoint, on the one hand, and the Company, on the other hand, of the engagement under the Agreement, or (ii) if the allocation provided by clause (i) above is not available, in such proportion as is appropriate to reflect not only the relative benefits referred to in such clause (i), but also the relative fault of each of Broadpoint and the Company, as well as any other relevant equitable considerations; provided that in no event shall Broadpoint's aggregate contribution to the amount paid or payable exceed the aggregate amount of fees actually received by Broadpoint under the Agreement (and in no event shall it include amounts received by Broadpoint as reimbursement of expenses). For the purposes of this Schedule A, the relative benefits to Broadpoint and the Company of the Agreement shall be deemed to be in the same proportion as (a) the total value paid or contemplated to be paid or received or contemplated to be received by the Company or its securityholders, as the case may be, in the Transactions that are contemplated by the Agreement, whether or not any such Transaction is consummated, bears to (b) the fees paid or to be paid to Broadpoint under the Agreement.

       The obligations of the Company hereunder shall be in addition to any liability which the Company may otherwise have to any Indemnified Person (whether in common law or otherwise) and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company or any Indemnified Person. This Agreement shall not be assigned by either party without the written consent of the other party.

       The Company shall not settle or compromise, or consent to the entry of any judgment in, or otherwise seek to terminate, any pending or threatened action, claim, suit, investigation, inquiry, arbitration or other proceeding in which any Indemnified Person is or may be a party unless (a) such Indemnified Person has given its prior written consent; or (b) such settlement, compromise, consent or termination includes an express unconditional release of such Indemnified Person from all Losses arising out of such action, claim, suit, investigation, inquiry, arbitration or other proceeding.

       In the event that the Company is considering entering into one or a series of transactions involving a merger, statutory exchange, consolidation or other business combination or a sale, exchange, dividend or other distribution, dissolution or liquidation of all or a significant portion of the Company's assets or any significant recapitalization or reclassification of the Company's outstanding securities, before entering into any such agreement or arrangement with respect thereto, the Company shall promptly notify Broadpoint in writing. If requested by Broadpoint, the Company shall then establish a means of providing for the Company's obligations set forth herein on terms and conditions satisfactory to Broadpoint.

       If multiple claims or causes of action are brought against Broadpoint in any Action and indemnification is permitted under applicable law and provided for under this Schedule A, the Company agrees that any judgment, arbitration award or other monetary award shall be conclusively deemed to be based on claims as to which indemnification is permitted and provided for hereunder.

Solely for the purpose of enforcing this Schedule A, the Company hereby consents to personal jurisdiction and to service and venue in the Bankruptcy Court presiding over the Company's bankruptcy Cases and any court in which any Action or claim which is subject to this Schedule A is brought by or against any Indemnified Person. Broadpoint hereby agrees, and the Company hereby agrees on its own behalf and, to the extent permitted by applicable law, on behalf of its securityholders and creditors, to waive any right to trial by jury with respect to any claim, counter-claim or action related to or arising out of or in connection with the Agreement, Broadpoint's services under the Agreement, any Transaction, occurrence or obligation contemplated by the Agreement, or any Indemnified Person's role in connection therewith.

The provisions of this Schedule A shall apply to the Agreement (including any related activities prior to the date hereof) and any modification or amendment thereof, and shall remain in full force and effect regardless of (i) whether or not any Transactions or services contemplated by the Agreement are initiated or consummated, (ii) any termination, completion or expiration of the Agreement, and (iii) whether or not Broadpoint is, or is not, called upon to render any particular services or advice in the course of its engagement under the Agreement.