

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ENTERED
02/12/2009

| | | |
|---|---|---|
| IN RE: | § | |
| GULF COAST OIL CORPORATION | § | CASE NO: 08-50213 |
| and | § | |
| CENTURY RESOURCES, INC. | § | |
| and | § | |
| NEW CENTURY ENERGY CORP. | § | |
| | § | |
| NEW CENTURY ENERGY CORP. | § | CASE NO: 08-50215 |
| | § | Jointly Administered Order |
| Debtor(s) | § | |
| | § | CHAPTER  11 |

## MEMORANDUM OPINION PROVIDING
## FINDINGS, CONCLUSIONS, AND REASONS FOR DENIAL
## OF MOTION TO SELL SUBSTANTIALLY ALL OF DEBTORS' ASSETS
## (DOC # 181)

Debtors (Gulf Coast Oil Corporation, Century Resources, Inc., and New Century Energy Corp.) are affiliated companies engaged in oil and gas exploration and production in South Texas.  After six relatively contentious months as a debtor in possession in chapter 11, after it became clear that a reorganization of Debtors' business was not possible, Debtors filed a motion to sell substantially all of Debtors' assets to the sole secured lender and, in connection with that sale, to assign to the purchaser various executory contracts important to maintaining the value of those assets.  For reasons set forth below, the Court concludes that Debtors have not demonstrated a substantial business reason for the § 363 sale in preference to a sale under a liquidating chapter 11 plan.  Therefore, the motion was denied by separate written order previously issued.

## I.      FACTS

The facts that the Court considers for purposes of this decision are undisputed.[1]

In June 2005, Debtors entered into an agreement with Laurus Master Fund, Ltd. ("Laurus").  The details of the transaction are reasonably complex (although not terribly unusual), but it is sufficient to note that Laurus held, and holds, a claim secured by all of the Debtors' assets.  Debtors and Laurus disagree about the amount of the secured claim.  Debtors contend that some of the default interest and penalty provisions are not strictly enforceable

---

[1] These facts were received by unopposed proffers at the hearing on January 27, 2009, from the Court's review of the pleadings filed in the case, and from the Court's determinations at hearings prior to the January 27 hearing.  The findings of fact are made solely for the purpose of deciding the motion to sell, and because the findings do not result from a contested, adversarial presentation these findings may have limited or no preclusive effect on other contested matters.

according to their terms while Laurus contends that they are.  Debtors and Laurus stipulate that the Laurus claim is not less than $66 million, while Laurus contends that the claim exceeds $90 million.  Debtors and Laurus have agreed that Laurus would be allowed to credit bid $75 million if the Court authorized the § 363 sale.

On July 28, 2008, Debtors filed voluntary petitions commencing these cases under chapter 11 of the Bankruptcy Code.  In a declaration submitted in support of first day orders, Debtors' chief executive officer represented:

> The Debtors are an (sic) independent oil and gas exploration and production company.  The Debtors' major areas of operations are located onshore United States, primarily in McMullen, Matagorda, Wharton, Goliad and Jim Hogg Counties in Texas. Current 8/8ths daily production on company-operated properties is approximately 900 barrels of oil per day and 1.8 MMCFG per day.  All of the Debtors' oil and gas properties are operated by Century Resources, a wholly owned subsidiary of New Century. Century Resources is a bonded oil and gas operator (operator #141835) with the Railroad Commission of Texas.[2]

After consideration of the degree to which the affiliate Debtors' businesses are related, the value of Debtors' assets, the complex nature of oil and gas exploration and production, the complex nature of the legal relationships involving mineral leases and joint operating agreements, and the complexity of Debtor's business, the Court determined that the cases should be jointly administered under the Court's "complex case" procedures.  The Court issued an order establishing procedures for collection of proceeds of sale of oil and gas produced by Debtors, for payment of interest owners and taxing authorities, *etc.*[3]

Debtors' bankruptcy schedules list real property valued at $30 million (mineral leases and oil and gas wells).  While all valuation is complex and uncertain, valuation of oil and gas interests is especially difficult even when the world markets are less volatile than they have been in the past year.[4]  Amended schedules list approximately $120,000 of claims held by prepetition,

---

[2] Docket # 10

[3] Oil and gas exploration and production is a particularly complex business. The Texas bankruptcy bar recently proposed standardized procedures to improve uniformity, efficiency, and predictability in oil and gas bankruptcy cases.  Those procedures were published by the Bankruptcy Court for the Southern District of Texas for comment from the public and from the bar at large.  The judges of this district are considering the comments that were received.  The bar made additional recommendations for revision or supplementation of the Court's  "complex case" procedures and for common motions such as § 363(b) sales, financing orders, *etc.*  Those recommendations were likewise published for comment and the comments are being considered by the Court.  In the meantime, the Court has adopted interim procedures.  Information about the interim procedures and about the Court's progress with respect to the bar's recommendations can be found on the Court's website.  The bankruptcy bar's proposal with respect to § 363(b) sales would not define when such a sale would be appropriate or when the Court would approve such a sale.  Rather, the proposal tries to establish uniform, effective, and efficient procedures for a § 363(b) sale if such a sale is appropriate.  This opinion attempts to address the circumstances under which such as sale is appropriate, rather than focusing on the procedures for the sale.

[4] The bankruptcy schedules were filed August 13, 2008, presumably reflecting values as of the date of the bankruptcy filing in July.  Oil prices at the end of July 2008, were approximately $130 per barrel.  At the end of January 2009, oil prices were about $41 per barrel.  (Energy Information Administration Official Energy Statistics

unsecured, non-priority creditors.  At the hearing on January 28, Debtors' counsel represented that there were $200 to $300 thousand of unsecured, pre-petition, non-priority claims that would not be paid if the Court authorized a sale of assets to Laurus.

Since April, 2008, Debtors have marketed their assets.  Debtors have received no firm offers, and the only expressions of interest that Debtors have received are in the range of $10 to $19 million.

Approximately 2 months after the case was filed, after contested motions and entry of interim orders, Debtors and Laurus entered into a final agreement for use of cash collateral that was noticed to all creditors and parties in interest.[5]  The agreement (i) stipulates to the validity, priority, perfection, extent, and "non-avoidability" of Laurus' liens, (ii) allowed for routine use of cash to operate the business, (iii) conditionally allowed certain development expenditures, (iv) provided replacement liens, and (v) included other provisions usually found in an agreed cash collateral order.  However, the agreement also required Debtor to file a chapter 11 plan "on or before" November 24, 2008.  The agreement reserved Laurus' right to object to Debtors' plan and provided that Laurus was entitled to relief from the automatic stay (without further Court order) if the plan was not filed by November 24 or was not confirmed by January 18, 2009.  There being no objection to the order, and considering the representations at the hearing, the Court approved the agreement and it became a court order.

The cash collateral order included a provision for payment of a percentage of routine, recurrent expenses of the Debtor's professionals, subject to a holdback.  The order did not provide for payment of all administrative claims that might arise during the case.

Debtors filed a chapter 11 plan and disclosure statement on November 7, 2008.  But by mid-December, with prices for oil and gas plunging on the world markets, Debtors concluded that Laurus' secured claim substantially exceeded the value of Debtors' assets.  In addition, Debtors concluded that their revenues and cash flow in the foreseeable future would be inadequate to support a plan of reorganization.  Laurus was unwilling to support a plan of reorganization.  The Debtors negotiated with Laurus concerning how to proceed.

Debtors then abandoned their chapter 11 plan and, on December 19, 2008, Debtors filed a motion to sell all of their assets.[6]  The motion recites the preceding facts and asks for authority to sell all of the property of the estate, including all cash, oil and gas properties, fixtures, equipment, inventory, and office equipment, free and clear of all liens, claims, and encumbrances.

---

from the US Government Weekly All Countries Spot Price FOB Weighted by Estimated Export Volume.)  Gas prices at the end of July 2008 were approximately $8 per MMCF and are currently approximately $4.25 per MMCF (Energy Information Administration Official Energy Statistics from the US Government NYMEX Natural Gas Futures Near-Month Contract Settlement Price and Henry Hub Natural Gas Spot Price).  These figures are intended solely to put in perspective the agreement by counsel at the hearing that oil and gas prices had declined precipitously since the bankruptcy case was filed.

[5] Docket # 95
[6] Docket # 181

The motion proposes an auction to be held in the bankruptcy courtroom on January 27, 2009, and the motion sets out complex procedures for the auction, but given Debtor's experience in trying to sell the property for over 8 months, there seems to be little potential for a meaningful auction.  The parties recognize that there is no material prospect that there will be any bidders except Laurus, and the Court is confident that the parties anticipate that Laurus will be the purchaser.[7]  In addition, even if a potential purchaser were located, it is not at all clear that the proposed auction procedure would allow adequate time for the purchaser to do due diligence necessary to purchase oil and gas interests.  A proposed form of sale order (18 pages long) was filed on January 9, 2009.[8] A form of asset purchase agreement (40 pages long) that would bind any potential purchaser was filed January 16, only 11 days prior to the proposed auction.[9]  Since Debtors have received no meaningful expression of interest to purchase the assets, and since there is virtually no time available for due diligence and compliance with the terms of the proposed asset purchase agreement, notwithstanding the auction procedure proposed, the Court concludes that Laurus is the only potential purchaser.

The motion asks for the property to be sold free and clear of all liens, claims and encumbrances, but implies that creditors with lien rights will be protected because their liens, claims, and encumbrances will be transferred to the sale proceeds.[10]  But that protection is illusory.  There will be no proceeds to which the liens, claims, and encumbrances can attach.  If Laurus credit bids there are no proceeds to which liens can attach.  In the unlikely case that someone outbids Laurus, the proceeds of the sale will be paid to Laurus and therefore there are similarly no proceeds to which the liens can attach.[11]

Laurus proposes to assume certain executory contracts.  However, the executory contracts were not identified until January 9, 2009, only 18 days prior to the proposed auction.[12]  Laurus has contacted Debtors' employees and vendors.  If the Court approves the sale, Laurus will continue to employ some of the employees and will continue to do business with some vendors.  Laurus represents that it has not entered into any binding commitments on either.  Laurus did not disclose any further details about its intentions with respect to either.

---

[7] Docket # 181, paragraph 25:  "Since April 2008, Broadpoint Capital, Inc., the Debtors (sic) financial advisors (sic), has contacted over 40 parties in an effort to market the Debtors and/or their assets. During the course of the case, several institutions entered into confidentiality agreements with the Debtors in order to perform detailed due diligence. Management presentations were also held with several parties and access to the Debtors reserve engineers was provided. While interested parties remain involved in the process, the volatility in commodity prices coupled with the general deterioration of market conditions in the second half of 2008 created a dynamic whereby the marketing process has to date yielded no formal proposals."

[8] Docket # 196, Exhibit B ("Proposed Order re Approving Sale of Assets")

[9] Docket # 198, Exhibit A ("Asset Purchase Agreement")

[10] *But see* Kuney, "Misinterpreting Bankruptcy Code Section 363(f) and undermining the Chapter 11 Process", 76 Am. Bankr. L.J. 235 (2002) which argues that § 363 sales can only be made free of interests, not free of claims.

[11] Paragraph 30 of the motion states: "If Laurus is not the winning bidder then upon the closing of the sale of the Property, Laurus will receive all of the net proceeds of the sale of the Property in full satisfaction of its secured claims. If, however, Laurus is the winning bidder at the Auction via its credit bid, then Laurus shall be deemed paid in full and Laurus's allowed claims against the Debtors shall be satisfied and all of Laurus's claims against the Debtors shall be forever barred and released.

[12] Docket # 196

Debtors' financial advisors (Broadpoint Capital Inc.) objected to the sale. The objection alleges that the proposed transaction does not pay all administrative expenses of the bankruptcy estate and that releases granted under the proposed sale order could impair Broadpoint's assertion of claims against Laurus. Laurus agrees with the former, but disputes the latter. It is unnecessary for purposes of this decision to determine whether Broadpoint or Laurus is correct about whether Broadpoint has claims against Laurus and about whether those claims would be within the ambit of the releases included in the proposed form of § 363(b) sale order. The Court has reviewed the documentation and finds that Broadpoint makes at least a colorable claim.[13]

The automatic stay that prohibits Laurus from asserting its lien rights has terminated by virtue of the agreed cash collateral order. Therefore Laurus may foreclose on the assets.

Debtors' counsel represented that if the Court authorizes the sale, Debtors will retain no assets. Although Debtors' counsel stated that Debtors have not decided what to do following the sale, the only two possibilities seem to be dismissal of the bankruptcy case or converting the case to chapter 7 as a no-asset case.

## II.    CONCLUSIONS OF LAW

### A.    The Bankruptcy Code

There are two sections of the Bankruptcy Code applicable in chapter 11 that explicitly authorize the sale of property. Section 363(b) authorizes a trustee to sell property of the estate outside the ordinary course of business. Section 1123 provides that a chapter 11 plan may include provisions (i) for transfer of all or any party of the property of the estate,[14] and (ii) for sale of all or any part of the property of the estate.[15] A § 363(b) sale is generally viewed as quicker.[16] Only a motion and a hearing are required, and most courts apply a "business judgment test" to determine whether to approve the sale.[17] By contrast, confirmation of a chapter 11 plan usually involves (i) preparation, court approval, and distribution of a disclosure statement,[18] (ii) voting by creditors to accept or to reject the plan,[19] and (iii) determination by the Court of whether the plan meets statutory confirmation standards.[20]

---

[13] Paragraph 15 of the proposed order authorizing the sale provides that any party asserting a claim against Debtors (or against Debtors' property) is enjoined from seeking to recover that claim against Laurus or any of its related parties. Broadpoint asserts that it has a claim against Debtors for services rendered as Debtors' financial advisors, and it is clear that the claim will not be paid if the Court authorizes the sale. Broadpoint also asserts that it has a cause of action against Laurus if its claim against Debtors is not paid. The Court has some doubt that Broadpoint has claims against Debtors, but the Court agrees that paragraph 15 of the proposed sale agreement potentially precludes the assertion of that claim.

[14] Bankruptcy Code § 1123(a)(5)(A).

[15] Bankruptcy Code § 1123(a)(5)(D).

[16] *Collier on Bankruptcy* ¶ 363.02[3].

[17] *Id.* ¶ 363.02[1][f].

[18] Bankruptcy Code § 1125.

[19] Bankruptcy Code § 1126, 1129(a)(7).

[20] Bankruptcy Code § 1129.

The Bankruptcy Code does not provide any explicit guidance to determine when § 363(b) is the appropriate procedure and when § 1123 is the appropriate procedure.

B.      Jurisprudence in the Court of Appeals for the Fifth Circuit

1.      *In re Braniff Airways, Inc.* 700 F.2d 935 (5th Cir. 1983)—"*Braniff*"

The appellants in *Braniff* asked the court to hold that a debtor in possession in chapter 11 could not sell or dispose " … of all of the assets of a debtor, and that such a transaction must be effected pursuant to the voting, disclosure, and confirmation requirements of the Code."[21]   The Court declined to reach that determination.  The Fifth Circuit reversed the district court's approval of the transaction because the court found that the transaction established the terms of a chapter 11 plan *sub rosa*, because the transaction required secured creditors to vote a portion of their deficiency claim in favor of a plan supported by the unsecured creditors' committee, and because the transaction required all parties to release claims against the debtor.

The essence of the holding is that a "sale" is merely a transfer of assets for value, possibly including provisions for adequate protection.[22]   When the court order approving the sale expands to affect creditors and other parties in interest in a significant way, when it effectively "short circuits the requirements of Chapter 11 … by establishing the terms of the plan *sub rosa* …", or when it includes unauthorized releases, the transactions cannot be authorized under § 363(b).[23]

The Fifth Circuit expressed its concern for " …[T]he Code's carefully crafted scheme for creditor enfranchisement where plans of reorganization are concerned."[24]   The court held that when a transaction materially interfered with that "carefully crafted scheme", the transaction could not be authorized by a bankruptcy court under § 363(b).  But the Fifth Circuit also expressly declined to hold that the sale of all property of the estate was *per se* improper.  The court did not articulate the boundaries for a § 363(b) sale.  The Fifth Circuit simply listed the "three examples" in the transaction at issue that impermissibly offended the standard.

2.      *Richmond Leasing Co. v. Capital Bank N.A.*, 762 F.2d 1303 (5th Cir. 1985)—"*Richmond Leasing*"

The bank in *Richmond Leasing* argued that assumption of a lease under § 363 constituted a *sub rosa* plan because it allowed the lessor to look to assets other than the revenues from the leased property for payment of its claims, to assert a large administrative claim in case of default on the lease, and to get relief from the stay in certain circumstances.  The Fifth Circuit rejected the bank's argument.  The decision concludes that the assumption of the lease gave the lessor only minimally greater rights than the lessor had under the original lease.  The court distinguished *Braniff* by referring to and distinguishing the three aspects of the transaction that

---

[21] *Braniff*, at 939.

[22] *See Braniff* footnote 2.

[23] "   [T]he PSA transaction also provided for the release of claims by all parties against Braniff, its secured creditors and its officers and directors. On its face, this requirement is not a "use, sale or lease" and is not authorized by § 363(b)."  *Braniff* at 940.

[24] *Id.*

the court explicitly found excessive in *Braniff*.  Specifically, the court held that the transaction in *Richmond Leasing* did not " … alter creditors' rights, dispose of assets, and release claims to the extent proposed in [*Braniff*]."[25]

The court, in dicta, stated that " … the disposition of a 'crown jewel' asset might, in combination with other factors, severely restrict a future reorganization plan so as to amount to a *sub rosa* plan of reorganization even though all or substantially all of the debtor's assets were not involved in the transaction, [but] that is not the case here."

3.    *In re Continental Air Lines, Inc.* 780 F.2d 1223 (5th Cir. 1986)—
"*Continental Airlines*"

In *Continental Airlines*, the Fifth Circuit provided a more extended discussion of the context in which § 363(b) operates.  The court recognized that it is implicit in § 363(b) that the sale must be justified by the debtor in possession or trustee, and that the debtor in possession or trustee has a fiduciary duty to parties in interest.  The court then described in detail the factors that drive a decision on a 363(b) motion.

> In *Braniff* we recognized that a debtor in Chapter 11 cannot use § 363(b) to sidestep the protection creditors have when it comes time to confirm a plan of reorganization…[I]f a debtor were allowed to reorganize the estate in some fundamental fashion pursuant to § 363(b), creditor's rights under, for example, 11 U.S.C. §§ 1125, 1126, 1129(a)(7), and 1129(b)(2) might become meaningless.  Undertaking reorganization piecemeal pursuant to § 363(b) <u>should not deny creditors the protection they would receive if the proposals were first raised in the reorganization plan.</u> *See In re Allison,* 39 B.R. 300, 303 (Bankr.D.N.M.1984).  <u>At the same time, we fully appreciate that post-petition, pre-confirmation transactions outside the ordinary course of business may be required and that each hearing on a § 363(b) transaction cannot become a mini-hearing on plan confirmation.  Balancing these considerations,</u> we hold that when an objector to a proposed transaction under § 363(b) claims that it is being denied certain protection because approval is sought pursuant to § 363(b) instead of as part of a reorganization plan, <u>the objector must specify exactly what protection is being denied. If the court concludes that there has in actuality been such a denial, it may then consider fashioning appropriate protective measures modeled on those which would attend a reorganization plan.</u> [*Continental Airlines* at 1227, emphasis supplied.]

---

[25] *Richmond Leasing* at 1313.

4.      *In re Cajun Elec. Power Co-op., Inc.*, 119 F.3d 349 (5th Cir. 1997)— "*Cajun Electric*"

In *Cajun Electric*, the court reviewed a decision by a district court that would approve a compromise of controversy that transferred $100 million in assets and released certain claims among the parties.

In affirming the district court's approval of the compromise, the Fifth Circuit referred to the three provisions that it had found to be disqualifying in *Braniff* and then distinguished the transaction in *Cajun Electric*.  Critical to the conclusion that the *Cajun Electric* transaction was different were:  (i) the transaction did not dispose of all claims against Cajun, (ii) the transaction did not restrict creditors' rights to vote as they see fit, and (iii) the transaction did not " … dispose of virtually all of Cajun's assets, leaving 'little prospect or occasion for further reorganization."  Supporting the Court's decision was its conclusion that the transaction removed from the estate the principal impediment to reorganization and would in fact improve the potential for reorganization, "without denigrating the rights of the unsecured trade creditors."[26]

The *Cajun Electric* decision at least implicitly approves the *Richmond Leasing* dicta by finding, apparently as a significant part of its decision, that the property transferred was not the estate's "crown jewel," but was the estate's "white elephant."

5.      *In re Babcock and Wilcox Company,* 250 F.3d 955 (5th Cir. 2001)— "*Babcock and Wilcox*"

In *Babcock and Wilcox* the Fifth Circuit reviewed a debtor-in-possession financing arrangement that, the objecting creditor argued, (i) effected a substantive consolidation of the debtors and (ii) violated the absolute priority rules applicable to confirmation of a chapter 11 plan.  The court held that the first allegation was simply wrong; the order did not substantively consolidate the debtors.  With respect to the absolute priority rule, the creditor alleged that *Braniff* stood for the proposition that a bankruptcy court could not do in an interim order what the court could not do in a plan confirmation order.  In its opinion, the Fifth Circuit again explained *Braniff*:

> *Braniff* stands merely for the proposition that the provisions of § 363 permitting a trustee to use, sell, or lease the assets do not allow a debtor to gut the bankruptcy estate before reorganization or to change the fundamental nature of the estate's assets in such a way that limits a future reorganization plan.[27]

---

[26] *Id.*
[27] *Babcock  Wilcox* at 960.

C.     The Treatises

1.     *Collier on Bankruptcy, 15th Ed. Rev.*

A sale of the major part of the estate may, however, have the practical effect of deciding issues that would ordinarily arise and be addressed in connection with the confirmation of a plan of reorganization.  Because there is some danger that a section 363 sale might deprive parties of substantial rights inherent in the plan confirmation process, sales of substantial portions of a debtor's assets under section 363 must be scrutinized closely by the court.

There has been disagreement historically on the issue of whether and under what circumstances a chapter 11 debtor may sell substantial assets under section 363.  It is now generally accepted that section 363 allows such sales in chapter 11, as long as the sale proponent demonstrates a good, sound business justification for conducting the sale before confirmation (other than appeasement of the loudest creditor), that there has been adequate and reasonable notice of the sale, that the sale has been proposed in good faith, and that the purchase price is fair and reasonable. These factors are considered to assure that the interests of all parties in interest are protected and that the sale is not for an illegitimate purpose. Attempts to determine plan issues in connection with the sale will be improper and should result in a denial of the relief requested.[28]

2.     *Norton Bankruptcy Law and Practice 3d*

When the trustee seeks to sell all or substantial assets of the bankruptcy estate under Code § 363, courts may impose a heightened level of scrutiny on the transaction. Such sales are sometimes characterized as "*sub rosa*" plans in that, through the sale and liquidation of the debtor's assets they will substantially fix creditor recoveries without the procedural protections of a disclosure statement or a plan of reorganization. The seminal case refusing to approve a sale of substantial assets under the theory that such a sale constituted a *sub rosa* plan is *In re Lionel Corp.* In *Lionel Corp.*, the Second Circuit Court of Appeals refused to approve a sale of the debtor's major asset consisting of an 82% interest in a profitable corporation when the debtor could show no valid business reason for the sale, nor was a wasting asset involved which would justify the sale. The appeasement of the creditors' committee which had insisted on the sale was an unsatisfactory basis for such a sale not in the ordinary course of business. Notwithstanding the heightened scrutiny of substantial asset sales, courts will generally approve such sales without the procedural protections of a plan and disclosure statement when the debtor can establish a sound business justification for the sale.  A court is particularly likely to

---

[28] *Collier on Bankruptcy, 15th Ed. Rev.* ¶ 363.02[3].

authorize a sale of all or substantially all of the debtor's assets under Code § 363 and without a plan or disclosure statement when the debtor can show that not selling the assets would amount to a wasting of those assets. Similarly when a debtor can establish an emergency that necessitates the sale, the court will ordinarily approve a sale of all or substantially all the debtor's assets under Code § 363, particularly when the debtor can establish that the assets were fairly marketed, parties in interest were provided adequate notice of the proposed sale, and the sale is in the debtor's best interests.[29]

## III.     DISCUSSION

### A.     Developments in Practice Since 1997

The last material statement by the Fifth Circuit addressed to the intersection of § 363(b) sales and *sub rosa* plans in chapter 11 was over 10 years ago.  In that decade, chapter 11 practice has made quantum leaps.

Unprecedented liquidity in the capital markets, investment strategies that include significant claims trading in large cases, alleged "loan to own" strategies, active participation in bankruptcy cases by hedge funds and other non-bank lending entities, and venue selection based on a court's perceived propensity to approve § 363(b) sales without requiring satisfaction of chapter 11 confirmation requirements have altered the landscape of chapter 11 in large cases. While these factors have initially appeared in the very large cases, the practice in smaller cases has followed the lead of the larger cases.  As indicated in the following paragraphs, the result has been a huge increase in motions to sell substantial parts (or all) of the estate under § 363(b) prior to plan confirmation.

The memoranda filed with the court in support of and in opposition to 363(b) motions, the academic literature, professional journals, and seminar presentations have extensively dissected every factor, have debated whether this strategy shift has fundamentally changed (and according to some "killed") chapter 11, and have argued about whether that is a good thing or a bad thing.  Bar associations are eager to learn a judge's "position" on 363(b) sales as a guide to choice of venue.[30]

---

[29] 2 Norton Bankr. L. & Prac. 3d § 44:3.

[30] Choice of venue based on perceptions of judicial predispositions has been the subject of discussion in any number of fora, including the popular press.  The *Wall Street Journal* "Bankrutpcy Blog" had the following comment (although the blogger was discussing critical vendor motions, not 363(b) sales):  "New York judges are… willing to go along with critical-vendor programs, while courts elsewhere, specifically in Chicago, take a different and dimmer view of them.  And that is why so many fine Chicago bankruptcy attorneys travel wearily to Delaware and New York to get big case work.  It is also why a successful attack on the legality of critical-vendor programs could mean big change in the bankruptcy business."  *Wall Street Journal*, "Bankruptcy Beat", February 3, 2009, http://blogs.wsj.com/bankruptcy/2009/02/03/creditors-won%E2%80%99t-let-motor-coach-roll-over-them/.  Choice of venue could likewise be affected by perceived judicial views about § 363(b) sales.

"Proceduralists" (also called "efficientists")[31] see 363(b) sales (or perhaps preferably sales outside chapter 11) as desirable because they view them as maximizing creditor recovery "Traditionalists" (also called "rehabilitationists")[32] see dangers in these developments which they view as driven in large part by "creditors-in-possession".  Traditionalists believe that these developments fail to implement fundamental objectives of bankruptcy policy and are a significant cause of recidivism in chapter 11.  But both see the 363(b) sale strategy as having a huge impact on bankruptcy practice.

> Corporate reorganizations have all but disappeared.  Giant corporations make headlines when they file for Chapter 11, but they are no longer using it to rescue a firm from imminent failure.  Many use Chapter 11 merely to sell their assets and divide up the proceeds.[33]

> The concept of debtor reorganization and rehabilitation is in peril.  The marvel of modern reorganizations of financially distressed businesses that was ignited by the railroad equity receiverships of the nineteenth century and codified by twentieth-century legislation is fading.  As the twenty-first century progresses, the use of Chapter 11 of the Bankruptcy Code as a primary reorganization and rehabilitation tool for businesses is under relentless attack--an attack led by those who want to revert back to strict enforcement of contracts and the primacy of creditor rights.  Fundamental changes in the economy, accompanied by a shifting and more conservative intellectual approach, are now leading to cries that Chapter 11 is obsolete and irrelevant in a modern economy.[34]

Some perceive 363(b) sales as critical to producing maximum value with least expense.

> Asset sales under §363 of the Bankruptcy Code have become the preferred method of monetizing the assets of a debtor company…The §363 process ordinarily involves a chapter 11 debtor/seller and a prospective buyer presenting a fully negotiated asset purchase agreement (APA) to the bankruptcy court for approval. This purchase agreement then becomes the template against which other potential buyers bid in an auction, pursuant to a set of court-approved procedures. Once a winning bidder is selected, the transaction closes with the sale being free and clear of prior liens and most claims, including claims by creditors that have not been paid at the time of the sale.

---

[31] For a discussion that divides scholars of bankruptcy theory into "proceduralists" and "traditionalists," *see* Baird, "Bankruptcy's Uncontested Axioms" 108 YLJ 573 (1998).  *See also* Brege, "An Efficiency Model of Section 363(b) Sales", 92 Va.L.Rev. 1639 (2006).  The terms "rehabilitationists" and "efficientists" are discussed in Sprayregen and Higgins, "Chapter 11: Not Perfect, but Better than the Alternative", ABI Journal, Vol. XXIV, No. 8, p. 1, October 2005).

[32] *Id.*

[33] Baird and Rasmussen, "The End of Bankruptcy", 55 Stan. L. Rev. 751 (2002).

[34] Miller and Waisman, "Is Chapter 11 Bankrupt", 47 B.C.L. Rev. 129.

The process often has the advantages of speed and the ability to maximize asset value through sale of the debtor company as a going concern. It is not unusual for a §363 sale to be completed within two to three months after a bankruptcy filing. The assets are cleansed in that they are sold, with certain limited exceptions, free and clear of liens, claims and liabilities. Also, a §363 sale can often yield the highest price for the assets because of the buyer's ability to select liabilities it will assume and to purchase a going-concern business.

From the seller's standpoint, the §363 process is advantageous because it can limit exposure of directors and officers of the seller for breaches of representations and warranties. In addition, a secured creditor can "credit bid" or take an ownership interest in the company by bidding a reduction in the debt the company owes, although, from a practical standpoint, there typically needs to be a cash outlay by the secured creditor to purchase the company in order to address the unsecured creditor constituency and cure certain claims.[35]

But others see perceive significant potential for abuse in § 363 sales:

Testifying before the Subcommittee on Commercial and Administrative Law in 2004, Lynn M. LoPucki stated that Bankruptcy Code § 363 sales are "fraught with potential for abuse." Others have described § 363 preplan business sales as "hijacking chapter 11" or "side-stepping creditor protections."… The strategic use of [§ 363] allows the debtor to not only "cherry pick" advantageous protections from chapter 11 but also to achieve a quick approval for the sale of all or substantially all of its assets without complying with chapter 11 requirements for plan confirmation. The stark contrast between chapter 11's numerous and intricate requirements for plan confirmation  and the nominal requirements for § 363 sales naturally causes tension. The preplan business sale is attractive to debtors because of its ease, speed, and finality.  The lack of transparency, the pace of the process, and the inconsistent treatment by the courts, however, leave the bankruptcy courts and parties in interest vulnerable to unfair dealing, abuse, and sweetheart deals.[36]

More recent decisions and academic literature have called into question some of the fundamental assumptions about just how final and how "free and clear" asset sales under § 363(b) are.  At least one academic contends that sales under § 363(b) cannot be made "free and clear" of claims.[37]  A recent decision out of the 9th Circuit BAP holds that the sales can be made free and clear of consensual liens, but holds that a credit bid by a secured creditor does not convey title free and clear of junior consensual liens, even though that might be possible in

---

[35] Steinberg, "The Seven Deadly Sins in §363 Sales", ABI Journal, 2005.
[36] Rose, Elizabeth B., "Chocolate, Flowers and Section 363(b): The Opportunity For Sweetheart Deals Without Chapter 11 Protections", 23 Emory Bankr. Dev. J. 249 (2006).
[37] Kuney, *supra*.

confirmation of a chapter 11 plan.[38]  That decision also casts some doubt on the finality of provisions of § 363(b) sale orders that extend beyond mere transfer of title.

Notwithstanding questions about important aspects of § 363(b) sales, the expansion of § 363 continues.  The most recent expansion of § 363(b) sales is to include assets that were not technically property of the estate.

> In the early morning hours of Sept. 20, 2008, an order (sale order) was entered in the most important hearing ever conducted in a bankruptcy case.  Lehman Brothers Holdings Inc. (debtors) had filed its chapter 11 petition five days earlier, and its sale motion only three days before entry of the sale order.
>
> The sale order approved the sale of the debtors' brokerage operation, primarily housed in the regulated entity Lehman Brothers Inc. (brokerage), to Barclay's Capital Inc. The amount of assets involved in the sale is somewhat unclear, but the sale order involved not less than $50 billion as noted by the debtors' counsel.
>
> The debtors' case began on Monday, Sept. 15.  The first-day motions in the case were heard on Tuesday. On the third day of the case, the debtors filed their motion to: (1) schedule a sale hearing; (2) establish sale procedures; (c) approve a break-up fee; and (4) approve the sale of assets and the assumption and assignment of contracts ("brokerage sale motion"). On the same day that the breakup fee and bid procedures were approved, the sale hearing began.
>
> Before the hearing, more than 50 objections to the brokerage sale motion were filed by a wide variety of parties. On the morning of the sale hearing, the brokerages' Securities Investor Protection Corp. (SPIC) proceeding was commenced and removed to the bankruptcy court.  After an almost nine-hour hearing, the sale of the assets of the brokerage and other entities was approved.  Two appeals have been filed on the sale order and at the time of this article they appear to be proceeding without the posting of a bond or the granting of a stay…
>
> [T]he bankruptcy court authorized the sale under §363 of the "purchased assets."  Purchased assets were defined in the asset-purchase agreement to include not only brokerage assets owned by the debtors and brokerage, which were before the bankruptcy court as a result of the SIPC proceeding, but also all assets owned by these companies' direct and indirect subsidiaries that were used in connection with the brokerage business.

---

[38] *In re PW, LLC  (Clear Channel Outdoor Inc.)* 391 B.R. 25  (9th Cir.BAP (Cal.),2008)

> In short, it appears that the bankruptcy court approved the sale of assets that were not part of any of the existing bankruptcy estate. Indeed, the court not only sold these assets, but it "cleansed" the assets of future claims.[39]

In footnote 4 the article at least partially justifies what some might view as hyperbole in its opening paragraph.  The decision to give federal judicial imprimatur and authority to this extraordinarily sale was based at least in part on testimony to the effect that:  "Any failure to consummate [the Barclay's sale] may potentially cause a major shock to the financial system."  It also quotes the bankruptcy judge's finding that " …in unrebutted testimony [Mr. Ridings] indicated through proffer that the markets, in effect, would tank [if the sale was not approved]."

B.    Conclusion

It would be very helpful if the Fifth Circuit were to take another look at the boundaries of § 363(b) sales to provide more guidance to the bankruptcy courts in the circuit.  Under the existing jurisprudence

- The debtor in possession or trustee in a chapter 11 case must consider its fiduciary duties to all creditors and interest holders before seeking approval of a transaction under § 363(b).
- The movant must establish a business justification for the transaction and the bankruptcy court must conclude, from the evidence, that the movant satisfied its fiduciary obligations and established a valid business justification.
- A sale, use, or lease of property under § 363(b) is not *per se* prohibited even though it purports to sell all, or virtually all, of the property of the estate, but such sales (or proposed sales of the crown jewel assets of the estate) are subject to special scrutiny.
- Parties that oppose § 363(b) transactions on the basis that they constitute a *sub rosa* chapter 11 plan must articulate the specific rights that they contend are denied by the transaction.
- Although the bankruptcy court need not turn every § 363(b) hearing into a mini-confirmation hearing, the bankruptcy court must not authorize a § 363(b) transaction if the transaction would effectively evade the "carefully crafted scheme" of the chapter 11 plan confirmation process, such as by denying §§ 1125, 1126, 1129(a)(7), and 1129(b)(2) rights.
- If the bankruptcy court concludes that such rights are denied, then the bankruptcy court can only approve the transaction if it fashions an appropriate protective measure modeled on those which would attend a reorganization plan.
- Transactions that explicitly release all (or virtually all) claims against the estate, predetermine the structure of a plan of reorganization, and explicitly obligate parties to vote for or against a plan are not authorized under § 363(b).

---

[39] Lubben, "The Sale of the Century and Its Impact on Asset Securitization: Lehman Brothers", 27 Am. Bankr. Inst. Journal Vol. 10, page 1 (2009.)

IV.      APPLICATION OF THE JURISPRUDENCE TO THESE FACTS

A.      Factors that a court can consider in determining whether to approve a § 363(b) sale prior to confirmation of a chapter 11 plan.

To decide a motion to sell substantial parts of the bankruptcy estate under § 363(b), the bankruptcy judge must weigh all of the facts and circumstances of the case and must determine whether safeguards are necessary to protect rights that could be exercised in the context of plan confirmation.  If safeguards are necessary, the bankruptcy judge must determine whether adequate safeguards can be fashioned.

1.      Is there evidence of a need for speed?

Disposition of perishable assets is the archetype justification for a § 363(b) sale.  Similar to the need to sell "perishable assets" is the need for a quick sale to avoid adverse, but looming, market or business conditions.[40]  This Court has found that a § 363 sale of a construction business was justified when immediate control by the purchaser was necessary to complete existing contracts to avoid massive loss of value.  This Court has also authorized § 363(b) sales related to offshore oil and gas production; the evidence substantiated the contention that immediate sale prior to the hurricane season was necessary to allow the purchasers to take charge of their new assets immediately to assure their surviving the storms.  The Court has also seen situations in which immediate sale was necessary to avoid substantial expenses to preserve the property.  There are, no doubt, other fact patterns that justify immediate sale.  The Court must be concerned about a slippery slope.  Not every sale is an emergency, and, as discussed more fully below, the reliability of uncontested evidence (and particularly the reliability of testimony that is not adequately cross-examined) is suspect.

2.      What is the business justification?

While the courts universally refer to "business justification", and "business judgment," those terms are not well defined for purposes of § 363(b) sales.  One might simply import the familiar concepts from corporate law and from court oversight of trustees.  But a § 363(b) motion requires more.  A motion to sell all, or substantially all, of the property of the estate, a motion to sell the crown jewel, and a motion to sell that materially predetermine the structure and outcome of plan confirmation must (i) have business justification for the sale and sale process, and (ii) must have a valid business justification for the process occurring separate from the plan confirmation process and being consummated without satisfaction of the plan confirmation procedures and requirements.

3.      Is the case sufficiently mature to assure due process?

Emergency sales of perishable assets may be justified at the commencement of a case. But when assets are sold immediately after the case is filed, the court can have very little confidence that all parties in interest have adequately organized, have received adequate notice,

---

[40] A "going out of business sale" for a retail establishment during the Christmas season might be an example, or other circumstances might involve sale of the entire retail establishment to a strategic buyer in advance of the principal marketing season.

have obtained appropriate information, and have been able to participate in the proceedings.  It takes time for official committees of creditors and equity interests to organize and to engage counsel, for the committees to hire financial or other experts if necessary, for government regulatory agencies to mobilize to participate in cases where they have a regulatory or other public interest, and for other creditors and parties in interest to determine whether (and how) to participate in the case.  Proposals for quick sales, understood only by a few parties who would benefit from the sale, are inherently suspect.

    4.     Is the proposed APA sufficiently straightforward to facilitate competitive bids or s the purchaser the only potential interested party?

An asset purchase agreement (APA) could be structured to encourage or to discourage bidding.  Sometimes, for very valid reasons, there is only one potential purchaser.  But most of the proponents of § 363 sales argue that competitive markets are the assurance of *bona fide* sales for highest value.  The APA should clearly be designed to facilitate competitive bidding.

    5.     Have the assets been aggressively marketed in an active market?

The principal justification for § 363(b) sales is that aggressive marketing in an active market assures that the estate will receive maximum benefit.  Established public auction markets provide the best assurance of full value at any given time.  The absence of any market is problematic.

    6.     Are the fiduciaries that control the debtor truly disinterested?

As the Fifth Circuit discussed, a debtor-in-possession must exercise fiduciary duty in determining whether and how to propose a sale of assets.  If entities that control the debtor will benefit, or will potentially benefit, from the sale the court must carefully consider whether it is also appropriate to defer to their business judgment.

    7.     Does the proposed sale include all of a debtor's assets and does it include the "crown jewel"?

While neither is *per se* prohibited, the likelihood of approval of the § 363 sale is inversely proportional to the percentage of the value of the debtor's assets that are to be sold.

    8.     What extraordinary protections does the purchaser want?

There are many ways to acquire assets: sale, foreclosure, gift, *etc.*  Most of those do not provide the protections from successor liability and other exposure that a bankruptcy sale under a chapter 11 plan might provide.  The explicit statutory authority to transfer "free of any lien" involves a plan of reorganization.[41]  The Bankruptcy Code seems to treat negotiation and

---

[41] Bankruptcy Code § 1123(a)(5)(D).  *See* Kuney, "Misinterpreting Bankruptcy Code 363(f) and Undermining the Chapter 11 Process", 76 Am.B.L.J. 235.  This memorandum does not try to address whether § 363's reference to "interests" includes "claims."  *See* the discussion in *In re PW, LLC  (Clear Channel Outdoor Inc.) (supra)* concerning whether credit bids purchase free and clear of junior liens.  Those issue is left to another day.

acceptance (or cram down) of a chapter 11 plan as the *quid pro quo* for extraordinary bankruptcy benefits.  The range of protections that a purchaser might seek could be infinite.  The more extensive the protections that a purchaser seeks, the less likely the Court is to approve the sale outside of a plan.  As *Clear Channel* suggests, extensive protections are also problematic on appeal.

>    9.    How burdensome would it be to propose the sale as part of confirmation of a chapter 11 plan?

To confirm a chapter 11 plan, the plan proponent must file a plan and disclosure statement, must get the court to approve the disclosure statement, must distribute the plan and disclosure statement to impaired creditors, must solicit votes of impaired creditors, and must prove at a confirmation hearing that the requirements of § 1129 are satisfied.  In huge cases (*e.g.* Enron, Worldcom, Lehman Brothers) disclosure statements are awesome documents indeed.  And in those cases the plan confirmation process is quite burdensome and expensive.  Luckily, in large cases that require complex documents, there seem to be sufficient assets to pay the professionals.

But most cases are much smaller and simpler.  The Bankruptcy Code explicitly authorizes a plan proponent to use a single document to satisfy the requirements of both the plan and the disclosure statement in small business cases and authorizes a single hearing both to approve the disclosure statement and to rule on plan confirmation.[42]  A "small business debtor" is a debtor whose debts are less than $2,190,000.  The Bankruptcy Code does not prohibit simplification of procedures for debtors that are not small business debtors.  In fact, Bankruptcy Code § 105(d) requires a bankruptcy court to hold a case management conference at which the court will issue such orders as are appropriate for the expeditious and economical resolution of the case, including an order fixing the scope and format of the notice regarding the hearing on approval of the disclosure statement and an order providing for combination of the hearing on the plan and disclosure statement.[43]

The Code requires distribution of the plan and disclosure statement to all impaired creditors.  A § 363(b) motion must be served on all parties in interest.[44]  Arguably, at least in some cases, the motion must be served on more parties than the plan.

Courts generally require a movant to give 20 days' notice of the filing of a motion commencing a contested matter, such as a motion to sell.  FRBP 2002 requires 25 days' notice of plans and disclosure statements.  FRBP 9006(c) authorizes reduction of the 25 day requirement set by rule, although §1125(f) statutorily requires 25 days' notice of a small business plan confirmation.  Section 1125(f) authorizes combined plans and disclosure statements in small business cases and § 105(d) authorizes the court to combine them in other cases.  Proponents of § 363(b) sales routinely argue that the Court should exercise its equitable and inherent powers, if necessary, to authorize the sale.  But there is no apparent reason why it is more appropriate to

---

[42] Bankruptcy Code § 1125(f).

[43] Bankruptcy Judge Tom Small pioneered salutary procedures to accomplish this objective.

[44] FRBP 9014 requires the motion to be served on  "the party against whom relief is sought."  If the motion materially alters the potential for reorganization, it should be served on all parties in interest.

apply equitable powers aggressively to facilitate a § 363(b) sale than it is appropriate to apply equitable powers aggressively to let creditors vote on that proposal.  Therefore, when the Court determines that there is a need for speed, the delays for confirmation of a plan need not be significantly different from the delays for a § 363(b) sale.

It should not be substantially more difficult[45] to write a plan and disclosure statement to sell the estate than it is to write a motion to sell the estate.  Both require careful thought and significant disclosure.  The complex documentation of typical plans and disclosure statements seems to be a creature of practice and habit, not statute.  Jurisprudence concerning what should be included in a disclosure statement in a larger cases is cited as authority in simpler cases, and forms from larger cases are copied in small, simple cases.  But that is not required by the statute.  Bankruptcy Code § 1125 requires a disclosure statement to give sufficient information to permit a typical creditor to vote on the plan.  The long, complex, boilerplate legalese found in most disclosure statements in smaller, simpler cases probably does not meet the statutory requirement; a typical creditor probably cannot understand it.  It is difficult to understand why the disclosure required to sell the estate (in a way that permanently affects creditors' potential recovery) would be less than the disclosure necessary to propose a plan to sell the estate.  If the proposed result is equivalent, it is difficult to understand why the requisite disclosure should not be equivalent.

Utilizing the authority described in the preceding paragraphs, this Court has seen a plan and disclosure statement in a simple case provide completely adequate information in 6 typewritten pages supplemented by a balance sheet, comparative income statements, projection of cash flows for the plan term, and a copy of the APA.  All in all, the document was less than 15 pages and conveyed more information, better, than the typical separate plans and disclosure statements that are hundreds of pages long.

The accepted wisdom is that § 363(b) sales are quicker and less expensive than plan confirmation, but the accepted wisdom is not necessarily correct.  The party proposing a § 363(b) sale of the material part of an estate should be prepared to prove, not merely recite, that a §363(b) sale is quicker and less expensive.

10.     Who will benefit from the sale?

The Fifth Circuit has emphasized "[t]he Code's carefully crafted scheme for creditor enfranchisement where plans of reorganization are concerned."[46]  This "carefully crafted scheme" is effected in the statute by providing "… a balanced set of tools for both the debtor and the creditor that compelled negotiations and provided the necessary transparency for true multiparty bargaining."[47]

If only one party (or a few parties selected by the "loudest creditor"[48]) will benefit from the sale, the movant should be prepared to explain why the sale should take place in a bankruptcy

---

[45] Except in the mega, mega case.
[46] *Braniff, supra.*
[47] Comment, "Chocolate, Flowers, and § 363(b): The Opportunity for Sweetheart Deals Without Chapter 11 Protections", 23 Emory Bankr. Dev. J. 249 (2006).
[48] Taking a phrase from *Collier,* ¶363.03[3] *supra.*

case and why the bankruptcy court should provide the benefits for which Congress imposed substantial requirements.  If the sale will not follow the "carefully crafted [Congressional] scheme" by utilizing the "balanced set of tools for both the debtor and the creditor [and]… multiparty bargaining" then it is hard to justify entitling the few lucky parties to the extraordinary benefits that Congress provided for those who do satisfy the statutory plan confirmation requirements.

Secured lenders' contractual rights are defined under state law.  And whether one finds the "contractarians" Jackson[49] and Baird[50]; or the "rehabilitationist" Harvey Miller to be more persuasive, bankruptcy is, at its essence, a collective remedy intended to benefit all creditors, not just the secured lender.

The § 363(b) movant should be prepared to prove, not just allege, why it is appropriate to provide extraordinary bankruptcy authority and remedies solely for the benefit of a party whose contract under state law does not provide those remedies and benefits.  And if the proposed transaction will not even pay all of the expenses of the bankruptcy proceeding, it would be especially difficult to understand why the purchaser should get the benefit of extraordinary bankruptcy powers and remedies for which it did not pay.

11.     Are Special Adequate Protection Measures Necessary and Possible?

When any of the protections in the chapter 11's "carefully crafted scheme" are not satisfied, the bankruptcy court should "then consider fashioning appropriate protective measures modeled on those which would attend a reorganization plan."[51]

12.     Was the hearing a true adversary presentation?  Is the integrity of the bankruptcy process protected?

The Wall Street Journal uses a stock sentence in most stories involving chapter 11.  It states, essentially, that in chapter 11 a company reorganizes under the supervision of a federal bankruptcy judge.  But as one of the most experienced bankruptcy attorneys states, bankruptcy judges are sometimes handicapped by the lack of adequate presentation of evidence by truly adverse parties:

> [T]he bankruptcy judge is dependent upon the parties to present the necessary facts…  To a large degree, the bankruptcy judge is a captive of the parties, even when a group of creditors exerts a disproportionate influence on the process.[52]

---

[49] Jackson, "The Logic and Limits of Bankruptcy Law", 85 Mich.L.Rev. 1341 (1987).

[50] *Supra.* at footnote 31.

[51] *Continental, supra.*

[52] Miller and Waisman, "Is Chapter 11 Bankrupt", 47 B.C.L. Rev. 129. 155.  In the quoted passage, Miller was referring to lack of information with respect to feasibility of a plan, not lack of information regarding the details of a 363(b) motion.  But the essential point is that a bankruptcy judge is a captive of the process, and cannot know what is not presented.

Although attorneys have a duty not to mislead the Court even when a motion is unopposed, it is nevertheless true that a judge's perceptions will be focused and guided by what the attorneys choose to present, what they choose not to present, and how they choose to "spin" what they present. Competent judicial decisions require presentations that are truly adversarial. The judge has no vested interest in the outcome of the proceeding except to strive to satisfy public expectations concerning the competence of "judicial supervision" of the reorganization process. If adverse interests are not represented because the motion is brought too early in the case or because the parties most affected have insufficient financial stake, if the information available is inadequate for the significance of the decision, or if the result otherwise would bring the integrity of the federal judiciary into question, the judge might find the hearing simply inadequate to justify the relief requested.

13.     Other factors that apply to the case at hand.

Each case is unique. There may be other factors that tip the balance or that overweigh the evaluative factors set forth above.

B.     Application of these factors to Gulf Coast Oil.

There is no indication of a need for speed. There is no evidence that the assets are perishable or that any value will be lost through delay to permit plan confirmation.

Although there is no indication that an expedited plan process would not achieve the same result, that is not the test. The movant must show that there is a need to sell prior to the plan confirmation hearing. It is not sufficient to suggest in an uncontested hearing that the secured lender will be the only beneficiary under either scenario. The Fifth Circuit requires a showing of a business justification for the § 363(b) sale prior to plan confirmation, not merely a showing that it doesn't matter.

In this case, the essence of the proposed transaction is a foreclosure supplemented materially by a release, by assignment of executory contracts (but only the contracts chosen by the secured lender), by a federal court order eliminating any successor liability, and by preservation of the going concern. Congress provided a process by which these benefits could be obtained. That scheme requires bargaining, voting, and a determination by the Court that Bankruptcy Code § 1129 requirements are met. The Court sees no authority to provide the benefits of the Congressional scheme in this case without compliance with Congressional requirements.

Several significant confirmation requirements are not satisfied.
- The only administrative expenses that will be paid are those that the purchaser has previously agreed to pay or that the purchaser decides subsequently to pay (such as post-petition trade creditors.) The Court cannot make the finding required by § 1129(a)(9) that all of the administrative expenses will be paid.
- Because some unsecured creditors will probably be paid and others will not be paid, the Court cannot conclude that creditors with equal rights are treated alike, and thus cannot conclude that § 1122(a) and § 1129(a)(1) are satisfied.

- The Court does not know what employees will be retained and which ones will not, and therefore cannot make the determination required by § 1129(a)(5).  But perhaps more important, the Court cannot make the determination that the entities in control of the corporation did not have a conflict of interests when they negotiated with Laurus regarding the APA.

Although it is reasonable to conclude that Laurus is substantially undersecured and therefore that the price does not matter, the marketing process has proven that there is not an active market that assures a fair price.

Not only does the proposed sale include the "crown jewels" (such as they are) the proposed sale includes all of the other jewelry and assets.  If the Court approves the sale, the case will be dismissed or converted to chapter 7.  The only effect of the bankruptcy process would be to transfer the debtors' assets to its secured creditor with benefits that the creditor could not achieve through foreclosure.

After considering and weighing the existing Fifth Circuit jurisprudence and the preceding factors, the Court concluded that the sale should not be approved.  Therefore, by separate order recently issued, it was denied.

SIGNED 02/11/2009.

_Wesley W. Steen_

Wesley W. Steen
United States Bankruptcy Judge